# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1271
_____

Flandreau Santee Sioux Tribe, a federally-recognized Indian Tribe

*Plaintiff - Appellee*

v.

Kristi Noem, Governor of the State of South Dakota, et al.[*]

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: February 13, 2019
Filed: September 6, 2019

_____

Before LOKEN, COLLOTON, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

The Flandreau Santee Sioux Tribe is a federally recognized tribe that owns and operates the Royal River Casino & Hotel (the "Casino") and the First American Mart (the "Store") on the Flandreau Indian Reservation in Moody County, South Dakota.

_____

[*]We grant the State's motion to substitute Governor Kristi Noem and Secretary of Revenue James Terwilliger, in their official capacities, in place of former Governor Dennis Daugaard and former Secretary of Revenue Andy Gerlach.

The majority of patrons at the Casino and the Store are not members of the Tribe. The State of South Dakota (the "State") imposes a use tax on goods and services purchased within the State. See S.D.C.L. 10-46-2. When the Tribe failed to remit the use tax on goods and services sold to nonmembers at the Casino and at the Store, the State's Department of Revenue denied the Tribe renewals of alcoholic beverage licenses issued to the Casino and the Store.[1] The South Dakota Office of Hearing Examiners upheld the Department's decision.

The Tribe filed this action in the district court in November 2014, alleging, *inter alia*, (i) that imposing the use tax on purchases by nonmembers on reservation land is preempted by the Indian Gaming Regulatory Act ("IGRA") because all activity under the Royal River Casino name is "gaming activity"; (ii) that the use tax remittance requirement infringes inherent tribal sovereignty and violates federal common law; and (iii) that conditioning renewal of the Tribe's alcohol licenses on use tax remittance violates 18 U.S.C. § 1161. The parties stipulated that the State would treat the alcohol licenses as valid pending a decision on the merits.

Ruling on cross-motions for summary judgment, the district court held that IGRA expressly preempts imposing the use tax on nonmember purchases throughout the Casino, but does not preempt imposing the tax on nonmember purchases of goods and services at the Store. However, the court concluded, the State may not condition renewal of alcohol beverage licenses on the Tribe's remittance of use taxes imposed on nonmember purchases at the Store. The State appeals, arguing (i) federal law does not preempt imposition of its use tax on nonmember purchases at the Casino of goods

---

[1]See S.D.C.L. 35-2-24 ("No license under this title may be reissued to an Indian tribe operating in Indian country . . . until the Indian tribe or enrolled tribal member remits to the Department of Revenue all use tax incurred by nonmembers as a result of the operation of the licensed premises.").

and services the parties rather vaguely define as non-gaming "amenities,"[2] and (ii) the State may condition renewal of alcoholic beverage licenses on the Tribe's failure to remit validly imposed use taxes. Reviewing the grant of summary judgment *de novo*, and the facts in the light most favorable to the State, we disagree with the first contention but agree with the second. Accordingly, we affirm in part, reverse in part, and remand for determination of the appropriate remedy. See Casino Res. Corp. v. Harrah's Entm't, Inc., 243 F.3d 435, 437 (8th Cir. 2001) (standard of review).

## I. The State Tax Preemption Issue.

**A.** Absent a federal statute permitting it, "a State is without power to tax reservation lands and reservation Indians." Okla. Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458 (1995) (quotation omitted). If the legal incidence of a state tax falls on a Tribe or its members for sales made within Indian country, like the state motor fuels excise tax at issue in Chickasaw Nation, the tax is categorically unenforceable, without regard to its "economic realities." Id. at 458-60. In this case, however, it is undisputed that the legal incidence of South Dakota's use tax falls on nonmember purchasers of goods and services at the Casino and at the Store.[3] Thus, the *per se* rule against state taxation of reservation Indians does not apply.

When a State seeks to impose a nondiscriminatory tax on the actions of nonmembers on tribal land, its authority is not categorically limited. Instead, the Supreme Court applies a flexible analysis to determine whether state taxation of nonmembers on Indian land is proper, often called the "Bracker balancing test," a

---

[2]The parties define Casino amenities as including food and beverage services, the Casino's hotel and RV park, live entertainment events, and a gift shop.

[3]The complementary use tax applies only to transactions not subjected to the State's sales tax, the incidence of which falls on the seller. See Black Hills Truck and Trailer, Inc. v. S.D. Dep't of Revenue, 881 N.W.2d 669, 674 (S.D. 2016).

reference to the Court's decision in White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980). Each case "requires a particularized examination of the relevant state, federal, and tribal interests." Ramah Navajo School Bd., Inc. v. Bureau of Revenue of N.M., 458 U.S. 832, 838 (1982). In most cases, because Indian tribes are dependent sovereigns, the issue turns on whether federal legislation has preempted state taxation of nonmember activity on Indian land, which is "primarily an exercise in examining congressional intent." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 176 (1989). However, because of the long-recognized importance of tribal sovereignty, "questions of pre-emption in this area are not resolved by reference to standards of pre-emption that have developed in other areas of the law, and are not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.'" Cotton, 490 U.S. at 176, quoting Bracker, 448 U.S. at 145. Instead, Indian tax immunity jurisprudence relies heavily on the "significant geographical component of tribal sovereignty," which "provides a backdrop against which the applicable treaties and federal statutes must be read." Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 112 (2005) (cleaned up). Federal preemption is not limited to cases in which Congress has expressly preempted the state tax. Cotton, 490 U.S. at 176-77. Generally, "a State seeking to impose a tax on a transaction between a tribe and nonmembers must point to more than its general interest in raising revenues." New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 336 (1983).

Applying these principles, the Supreme Court has upheld some state taxes on nonmembers engaging in commercial activities on Indian lands, and held that other taxes were preempted. In Bracker, for example, the Court held that a State's use fuel tax on a nonmember's logging activity on tribal land was preempted by federal statutes and programs comprehensively encouraging and regulating logging on federal lands held in trust for Indians. In Ramah, the Court held that a State's gross receipts tax on a nonmember's activity in building a reservation school was preempted by the comprehensive federal regulation and financing of Indian education -- the tax was based on a general desire to increase state revenues and provided no specific offsetting

-4-

benefit to Indian education.  By contrast, in Cotton, the Court upheld a State's severance tax on oil and gas produced by nonmember lessees from wells on reservation land because state regulation provided substantial services to the tribe and the lessees, no economic burden fell on the tribe, federal regulation was extensive but not exclusive, and there was no evidence the tax affected the tribe's ability to attract lessees.  And in Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134 (1980), the Court upheld *both* the tribe's sovereign power to tax cigarette sales to nonmembers on the reservation, and a state excise tax on vendors who provided cigarettes for on-reservation sales to nonmembers.  The value of Indian sales to nonmembers was not generated by tribal activities, the Court explained, only by the exemption of such sales from state tax; neither principles of federal Indian law nor any federal statute preempted the State from taxing this "artificial competitive advantage over all other businesses in a State."  Id. at 155.

**B.**  In this case, the federal legislation most relevant to the use tax at issue is the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*  In California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987), the Supreme Court held that a California law limiting bingo could not be applied to high stakes tribal bingo and card games played predominantly by nonmembers at reservation facilities.[4]  The facilities were financed and the gaming approved by the Secretary of the Interior to promote tribal economic development.  The Court concluded that the federal and tribal interests in promoting Indian gaming outweighed the State's interest in preventing organized crime.  480 U.S. at 207-22.  In response, States sought federal legislation permitting state regulation of tribal gaming.  Congress passed IGRA the next year "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," and to establish an "independent Federal regulatory authority for gaming on Indian lands,

---

[4]The state laws at issue in Cabazon were regulatory, rather than state taxes imposed on nonmember commercial activities on a reservation.

[and] Federal standards for gaming on Indian lands." 25 U.S.C. § 2702(1), (3). IGRA sought to balance the competing federal, state, and tribal interests by giving each sovereign a role in the regulatory regime.

IGRA divides gaming into three classes of increasing regulatory significance. Class I games -- social games and traditional forms of Indian gaming -- are left to the exclusive jurisdiction of the Indian tribes.  See 25 U.S.C. §§ 2703(6), 2710 (a)(1). Tribes may engage in Class II games -- most forms of bingo and card games -- if they are authorized by and played in conformity with state law, subject to federal licensing and extensive regulation by the National Indian Gaming Commission. See 25 U.S.C. §§ 2703(7), 2710 (b)-(c).  All other forms of gaming are Class III games, which include casino table games and slot machines, the forms primarily involved in this case.  See § 2703(8).  A tribe may conduct Class III gaming on Indian lands only pursuant to, and in compliance with, a federally approved compact that the tribe has negotiated with the surrounding State.  See § 2710(d)(1)(C); Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 785 (2014).

A State receiving a request to negotiate a tribal-state compact governing Class III gaming activity "shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).  A tribal-state compact negotiated under subparagraph (A) "may include" provisions relating to six specific subjects, including two relating to State and tribal fees and taxation:

> (iii) the assessment by the State of such [gaming] activities in such amounts as are necessary to defray the costs of regulating such activity;

> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities.

25 U.S.C. § 2710(d)(3)(C).  IGRA contains no provision authorizing State taxation of Class III gaming.  Thus, it provides no legislative exception to the *per se* rule against state taxation of tribes and their members.  Subsection (d)(4) made clear that no such exception was intended:

> (4) Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity.

Here, the Tribe and the State entered into and maintain a gaming compact governed by IGRA, which provides the terms under which the Tribe is authorized to conduct gaming activities on the Reservation.  The compact allows for the operation of Class III gaming activity at the Casino and provides guidance for various facets of the Tribe's gaming operations.  It does not address whether the State may impose its use tax on nonmember purchases of goods and services at the Casino and the Store.

In concluding that IGRA expressly preempts the use tax, the district court reasoned that the prohibition on state taxation in 25 U.S.C. § 2710(d)(4) "applies to nonmembers on the Casino floor authorized to gamble, which includes the costs of associated activities, i.e., gamblers and what they spend on gambling, alcohol, food, rooms, and other merchandise from the Casino" (the amenities). But subsection (d)(4) is a lack of authorization, not a prohibition.  Here, the State seeks to exercise its authority under prior Supreme Court cases to collect use taxes on nonmembers for their purchases of amenities at the Casino, not for their Class III gaming activity that is authorized by IGRA and by the federally approved compact, which is silent on the subject of state taxation.  In <u>Bay Mills</u>, the Supreme Court noted that "'class III gaming activity'" is "what goes on in a casino -- each roll of the dice and spin of the

wheel." 572 U.S. at 792. Thus, subsection (d)(4) does not preempt state taxation of nonmember activity, other than "what goes on in a casino."

The Tribe further argued, and the district court agreed, that the State's imposition of its use tax on nonmember purchasers of amenities at the Casino is a subject that may be included in a tribal state compact because it falls within subsection (d)(3)(C)'s "catchall" provision, "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). The Tribe argues that the Casino's gift shop, hotel, RV park, food and beverage services, and live entertainment events would not exist but for the Casino, nor could the Casino operate without the existence of these amenities. Therefore, the amenities "are directly related to the operation of gaming activities," and the use tax at issue is expressly preempted by IGRA because it was not authorized by the Tribe's compact with South Dakota.

We reject this interpretation of the statute for related textual reasons. First, and most obviously, amenities such as a gift shop, hotel, and RV park are not *directly* related to Class III gaming activity as defined by the Supreme Court in Bay Mills -- "what goes on in a casino -- each roll of the dice and spin of the wheel." "Directly related to the operation of gaming activity" is narrower than "directly related to the operation of the Casino." We agree with the Tenth Circuit's interpretation of Bay Mills: "Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike." Navajo Nation v. Dalley, 896 F.3d 1196, 1207 (10th Cir. 2018).

Second, § 2710(d)(3)(C) lists subjects that a tribal-state compact authorizing Class III gaming *may* include. But it does not address the legal effect of non-inclusion. It is not surprising that the Tribe and South Dakota did not address in their gaming compact whether the State may impose its use tax on nonmembers for non-gaming activities at the Casino and the Store. That issue was not relevant to

-8-

regulating the Casino's Class III gaming. And even if the Tribe agreed, a provision that the Tribe would collect and remit a non-gaming state tax on nonmembers would risk disapproval of the compact by the Secretary of the Interior based on "[t]he very real concern . . . that a state may use its leverage over Class III gaming to exact a favorable resolution of issues unrelated to Class III gaming." Kevin Washburn, Recurring Issues in Indian Gaming Compact Approval, 20 Gaming L. Rev. & Econ. 388, 392 (2016). Both parties could sensibly conclude that state taxation of nonmembers should be left to existing federal law governing this issue, as it may be impacted by IGRA. Thus, the absence of a compact provision addressing the State's non-gaming use tax does not, *standing alone*, reflect that IGRA has *expressly* preempted the tax.

**C.** For these reasons, we conclude that the question of federal preemption in this case must be determined by conducting the analysis mandated by Bracker to determine whether the State's interests in imposing the tax outweigh the relevant federal and Tribal interests. Accord Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d 457, 469-71 (2d Cir. 2013); Barona Band of Mission Indians v. Yee, 528 F.3d 1184, 1193 (9th Cir. 2008). "Salient factors include the extent of federal regulation and control, the regulatory and revenue-raising interests of states and tribes, and the provision of state or tribal services." Felix S. Cohen, Handbook of Federal Indian Law 707 (2012), citing Cotton, 490 U.S. at 176-77, 186-90; Cent. Mach. Co. v. Ariz. State Tax Comm'n, 448 U.S. 160, 161-63 (1980); and Bracker, 448 U.S. at 150-51. Of great relevance are the broad policies that underlie IGRA and the history of tribal independence in the operation of gaming and gaming facilities. See Cotton, 490 U.S. at 176. "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." Mescalero Apache Tribe, 462 U.S. at 334; see Harrah's Entm't, 243 F.3d at 437.

The history of tribal sovereignty over a subject "serves as a necessary backdrop" to the preemption question. Cotton, 490 U.S. at 176. As the Supreme Court explained in Cabazon, there is a long history of tribal resistance to state regulation of their independent operation of gaming activities. Before Congress enacted IGRA in 1988, Cabazon confirmed that tribes were free from non-criminal state regulation of tribal gaming on reservations. IGRA endorsed substantial tribal independence and protected tribes from state interference in the operation of gaming activity, except for limited state regulation through Class III gaming compacts. The stated purposes of IGRA include "promoting tribal economic development, self-sufficiency, and strong tribal governments . . . ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation [and] protect[ing] such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702.

Even if the amenities at issue are not "directly related to the operation of gaming activities" within the meaning of § 2710(d)(3)(C)(vii), the summary judgment record established that the amenities contribute significantly to the economic success of the Tribe's Class III gaming at the Casino. The Tribe submitted evidence that over 90% of its sales tax revenues are generated by the 6% sales tax on transactions at the Casino and the Store. Casino departments offering the amenities operate at a loss, suggesting that goods and services are sold below cost to attract patrons and encourage gaming. The Tribe provided evidence that increases in patronage at one amenity is directly tied to increases in gaming activity itself. The Tribe also submitted evidence of the Casino's significance in promoting tribal economic development and self-sufficiency. Of the net revenues generated from the Casino and the Store, 40% is distributed by individual per capita payments; 35% of the remainder goes toward Tribal economic development, 15% toward Tribal government operations, 5% into a minors trust fund, 4% into a community assistance fund, and 1% into a local government revenue sharing fund.

The State's taxation of the Casino amenities would raise their cost to nonmember patrons or reduce tribal revenues from these sales. Even if gaming was not thereby reduced, the impact would be contrary to IGRA's broad policies of increasing tribal revenues through gaming and ensuring that tribes are the primary beneficiary of their gaming operations to promote economic development, self-sufficiency, and strong tribal governments. The State argues that any negative impact on the Tribe's finances is insufficient to preempt the tax, citing Cotton and Colville. We disagree.

In Cotton, the trial court found that the State regulated aspects of the on-reservation oil and gas development at issue and provided substantial services to the tribe and its lessee, and that "no economic burden falls on the tribe by virtue of the state taxes." 490 U.S. at 185-87 (cleaned up). The Court concluded that this indirect impairment of the federal policy favoring on-reservation oil and gas production "is simply too indirect and too insubstantial to support [the] claim of pre-emption." Id. at 187. Similarly, in Colville, no federally regulated tribal activity was involved, and the only benefit provided nonmembers by the tribe was a state tax exemption for their on-reservation cigarettes purchases. 447 U.S. at 154-59. Here, nonmembers benefit from the Casino's federally regulated gaming activities operated by the Tribe, and from amenities provided by tribal facilities such as the hotel, RV park, and gift shop.

We conclude the Tribe's on-reservation Class III gaming activity is analogous to the nonmember logging activity on tribal land at issue in Bracker, and to the nonmember activity in building a reservation school at issue in Ramah. In both cases, the Court held that state taxes whose economic burden fell on the tribes were preempted by federal statutes and programs comprehensively encouraging and regulating the nonmember activities, where the States did not have a "specific, legitimate regulatory interest" in the activity taxed, Ramah, 458 U.S. at 843, only a "generalized interest in raising revenue" that is insufficient to permit "intrusion into the federal regulatory scheme," Bracker, 448 U.S. at 150. The State's interest in

raising revenues to provide government services throughout South Dakota does not outweigh the federal and tribal interests in Class III gaming reflected in IGRA and the history of tribal independence in gaming recognized in <u>Cabazon</u>. As in <u>Bracker</u>, "this is not a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall." 448 U.S. at 150. Accordingly, we affirm the district court's conclusion that imposition of the South Dakota use tax on nonmember purchases of amenities at the Casino is preempted by federal law.

## II. The Conditional Liquor Licensing Issue.

The district court held that the South Dakota use tax may be imposed on nonmember purchases at the Store, and that the State "can require the Tribe to collect and remit such tax." <u>See</u> <u>Okla. Tax Comm'n v. Potawatomi Indian Tribe</u>, 498 U.S. 505, 513 (1991) ("the doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed . . . tax on their sales to nonmembers"), citing <u>Moe v. Confederated Salish and Kootenai Tribes</u>, 425 U.S. 463 (1976), and <u>Colville</u>, 447 U.S. at 134. The Tribe did not appeal those rulings.

When the Tribe failed to remit the use tax on goods and services sold to nonmembers, the State denied the Tribe renewals of alcoholic beverage licenses issued to the Casino and the Store because the use tax was not paid. <u>See</u> S.D.C.L § 35-2-24. This issue is not moot as to use taxes validly imposed on nonmember purchases at the Store. The district court held that the "imposition of a condition that the tribe remit all outstanding taxes on the renewal of an alcohol license" was not "reasonably necessary" to the assessment or collection of lawful state taxes. The court's Amended Judgment precluded the State from enforcing § 35-2-24 for the collection and remittance of a use tax on nonmember consumer purchases. The State appeals that ruling.

"Congress has divested the Indians of any inherent power to regulate" the use and distribution of alcoholic beverages in Indian country. Rice v. Rehner, 463 U.S. 713, 724 (1983). In enacting 18 U.S.C. § 1161, "Congress contemplated that its absolute but not exclusive power to regulate Indian liquor transactions would be delegated to the tribes themselves, and to the States." Id. at 728. Accordingly, the Court held in Rehner that a State may require a federally licensed Indian trader operating a general store on a reservation to obtain a state license to sell liquor for off-premises consumption. The State argues that conditioning liquor license renewals is well within its traditional police power as extended to the regulation of on-reservation liquor transactions by § 1161 and Rehner.

Like the district court, we conclude the issue is not that simple. Section 1161 provides the State with authority to regulate liquor on the reservation, just as the district court concluded it has authority to tax nonmember purchases of goods and services at the Store. But the question is whether the State's remedy for the Tribe's failure to collect and remit valid use taxes -- non-renewal of its liquor licenses -- is preempted by federal law. In resolving this issue, the Supreme Court applies the Bracker balancing test. See Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 73 (1994), citing Cotton, 490 U.S. at 176.

In Potawatomi, the Supreme Court held that tribal sovereignty barred Oklahoma from suing the tribe to enforce its valid tax on reservation cigarette sales to nonmembers, which would be "the most efficient remedy," but tribal sovereignty "does not excuse a tribe from all obligations to assist in the collection of validly imposed state sales taxes." 498 U.S. at 512, 514. The Court suggested five alternative remedies: (1) imposing liability on individual agents of tribes for failing to collect the taxes; (2) seizing untaxed goods in shipment to reservations; (3) collecting taxes from wholesalers off reservations; (4) entering into collection agreements with tribes; and (5) seeking congressional legislation. 498 U.S. at 514.

-13-

In Colville, tribes challenged detailed recordkeeping requirements imposed by the State to separate on-reservation cigarette sales to nonmembers, which were subject to state excise tax, from nontaxable sales to tribal members; the Court held the requirements "valid *in toto*" because "the Tribes have failed to demonstrate that the State's recordkeeping requirements for exempt sales are not reasonably necessary as a means of preventing fraudulent transactions." 447 U.S. at 160. In a subsequent case, wholesalers federally licensed to sell cigarettes to reservation Indians facially challenged New York's "probable demand" mechanism imposing a quota on their tax-exempt cigarette sales; the Court upheld the State restrictions on reservation retailers as "reasonably necessary" to curb the illicit flow of tax-free cigarettes. Milhelm Attea, 512 U.S. at 75-76. The Court has not applied its "reasonably necessary" standard in other contexts.

Here, the district court concluded that the State's licensing renewal condition was not reasonably necessary because "conditioning an alcohol license on taxes entirely unrelated to alcohol and its potential for substantial impact does not further the State's recognized interest" in § 1161 and in Rehner. But that is not the state interest at issue. The alternatives the Court suggested in Potawatomi are alternative remedies to "produce the [tax] revenues to which [the States] are entitled." 498 U.S. at 514. That the remedy may impose a burden that goes beyond collection of the tax does not mean it is not reasonably necessary to the State's interest in collecting the tax. Rather, the issue to be addressed under Bracker balancing is whether the remedy "will unduly interfere with Indian trading," or, in this case, with the Tribe's Class III gaming activity. Milhelm Attea, 512 U.S. at 76. On its face, the State's remedy seems no more burdensome than some alternatives suggested in Potawatomi -- imposing liability on tribal agents who fail to collect the taxes and seizing untaxed goods in shipment to the reservation. In either case, the tribal retailer is unable to continue its reservation business until it complies with the valid obligation to collect and remit State tax on nonmember purchases.

In the district court and on appeal, the Tribe did not address this issue, arguing only that SDCL § 35-2-24 "exceeds the authority delegated to the State [by 18 U.S.C. § 1161] because the tax remittance condition is not reasonably related to the State's interests in controlling the impacts of alcohol within its borders." As that assertion, even if true, does not address the "reasonably necessary" issue under Bracker, the Tribe has failed to meet its burden to demonstrate that the State alcohol license requirement is not reasonably necessary to further its interest in collecting valid state taxes. Colville, 447 U.S. at 160. Accordingly, Paragraph 3 of the district court's Amended Judgment declaring that the State "cannot condition renewal of any alcoholic beverage license issued to the Tribe on the collection and remittance of a use tax on nonmember consumer purchases" is reversed.

## III. Conclusion.

For the foregoing reasons, the Amended Judgment of the district court is affirmed in part and reversed in part. The case is remanded for further proceedings not inconsistent with this opinion.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

The Indian Gaming Regulatory Act does not expressly preempt South Dakota's use tax on purchases of non-gaming amenities at the Royal River Casino & Hotel by those who are not members of the Flandreau Santee Sioux Tribe. On this much, I agree with the court. The court proceeds, however, to affirm the district court's preemption ruling on an alternative ground—namely, that "the State's interests in imposing the tax" do not "outweigh the relevant federal and Tribal interests." I conclude that federal law does not preempt the South Dakota use tax on the purchase of non-gaming amenities by nonmembers, so I would reverse the judgment.

-15-

The Supreme Court last addressed the subject of state taxation of nonmembers for activity on an Indian reservation thirty years ago. The Court explained that "questions of pre-emption in this area are not resolved by reference to standards of pre-emption that have developed in other areas of the law." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176 (1989). What governs instead is "a flexible pre-emption analysis sensitive to the particular facts and legislation involved." *Id.*

The court here concludes that South Dakota's use tax on nonmember purchases of amenities is preempted because the case is analogous to *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982). Those decisions held that particular state taxes on nonmember activities undertaken on tribal land were preempted. The analogy to this case, however, is wanting.

*Bracker* involved a motor carrier license tax and use fuel tax that a State applied to a non-Indian logging company that operated on an Indian reservation. The Tribe had agreed to reimburse the company for any tax incurred as a result of its on-reservation business activity, so it was "undisputed that the economic burden of the asserted taxes [would] ultimately fall on the Tribe." 448 U.S. at 151. The Supreme Court held that the state taxes were preempted. The opinion cited a "pervasive" and "comprehensive" federal regulatory scheme governing tribal timber that left "no room for these taxes," as well as a failure of the State to "identify any regulatory function or service performed by the State that would justify the assessment of taxes." *Id.* at 148-49.

*Ramah* concerned a state tax imposed on gross receipts that a non-Indian construction company received from a tribal school board for the construction of a school on the reservation. Under standard industry practice, the school board reimbursed the construction company for all taxes due, so the ultimate burden of the gross receipts tax fell on the tribal organization. 458 U.S. at 835, 844. The Supreme

Court found the case indistinguishable from *Bracker* and declared the state tax preempted. The Court cited a "detailed regulatory scheme governing the construction of autonomous Indian educational facilities [that was] at least as comprehensive as" the scheme governing timber in *Bracker*, *id.* at 841, and emphasized that the State did "not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying [the] tax." *Id.* at 843.

The Court's next decision, however, cabined *Bracker* and *Ramah*. *Cotton Petroleum* considered a state severance tax on the production of oil and gas by non-Indian lessees of wells located on a reservation. In urging federal preemption of the state tax, the Tribe cited the Indian Mineral Leasing Act of 1938 and a congressional purpose to provide tribes with a profitable source of revenue from oil and gas leases. But the Court refused to find preemption of state taxation based on the indirect burdens that the state taxes imposed on this broad congressional purpose. Without "some special factor such as those present" in *Bracker* and *Ramah*, the indirect burdens were insufficient to justify invalidating the state taxes. 490 U.S. at 187. The Court expressed concern that a preemption ruling would mean a return to the "thoroughly repudiated doctrine" of intergovernmental tax immunity. *Id.*

In distinguishing *Bracker* and *Ramah*, the Court in *Cotton Petroleum* highlighted that the prior cases both "involved complete abdication or noninvolvement of the State in the on-reservation activity." *Id.* at 185. *Bracker* and *Ramah* also involved "exclusive" federal and tribal regulation of the nonmember activity, whereas the federal and tribal regulations in *Cotton Petroleum* were "extensive," but not "exclusive." *Id.* at 186. And *Cotton Petroleum* did not involve "an unusually large state tax" that "imposed a substantial burden on the Tribe." *Id.*

The situation here does not share the "special" characteristics that led the Court to find preemption in *Bracker* and *Ramah*. This is not a case of "complete abdication or noninvolvement of the State in the on-reservation activity." The State provides a

-17-

range of services for the Casino: law enforcement operations, R. Doc. 80-7, at 34; R. Doc. 119-11, at 7-13; R. Doc. 125-23, at 4-5; roads that facilitate the Casino's fifty-mile shuttle service for patrons, R. Doc. 80-7, at 16, 21, 28-29; R. Doc. 119-15, at 50; job training for a Casino employee from the State's Department of Human Services, R. Doc. 81-14, at 3-5; and inspection of Casino equipment by the State Fire Marshal, R. Doc. 119-21, at 7-8. Nor is federal and tribal regulation of the amenities "exclusive." The State issues an alcohol license to the Casino and regulates the service of alcoholic beverages, R. Doc. 32, at 14 (¶ 56); R. Doc. 80-10, at 13-14; the State's Department of Health licenses vendors who sell food products to the Casino, R. Doc. 80-10, at 4, 15-16; R. Doc. 82-4, at 4-6; and the Tribe purchases water from the City of Flandreau, whose water system operators are certified by the State's Department of Environment and Natural Resources, R. Doc. 80-2, at 8-9; R. Doc. 132-21, at 5-7. Although the state tax revenue derived from the sales of amenities would not equal the cost of the state services provided on the reservation, "[n]either *Bracker*, nor *Ramah* . . . imposes such a proportionality requirement on the States." *Cotton Petroleum*, 490 U.S. at 185.

*Bracker* and *Ramah* emphasized the existence of a comprehensive federal regulatory scheme of the activity taxed—logging operations and the construction of Indian schools, respectively. The Bureau of Indian Affairs exercised authority over the details of logging operations and school construction, and thereby placed administrative and economic burdens on both the Tribes and the non-Indian companies enlisted to help with the regulated activities. The federal regulation was so pervasive as to preclude an additional burden that state taxes would impose. Here, the absence of a comprehensive federal regulatory scheme that encompasses the provision of non-gaming amenities distinguishes *Bracker* and *Ramah* and leaves room for the State to apply its use tax.

The court concludes that the potential negative impact of the state tax on the Tribe's finances is sufficient reason to declare the state tax preempted. Even if

gaming is not reduced, the court believes, a reduction in tribal revenues from sales of non-gaming amenities would be contrary to the "broad policies" of the Indian Gaming Regulatory Act. To my eye, that submission is akin to the argument rejected in *Cotton Petroleum*, where the Court declined to accept that "[a]ny adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the state tax." *Id.* at 187. Even though it was "reasonable to infer that the [state] taxes have at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate," those indirect effects on a "broad" congressional purpose were insufficient to strike the state taxes without "more explicit guidance from Congress." *Id.* at 186-87. So too here. As in *Cotton Petroleum*, the "primary burden of the state taxation falls on the non-Indian taxpayers," *id.* at 187 n.18, and the indirect effects of state taxation on tribal finances do not justify a finding of preemption.

For these reasons, I would reverse the judgment of the district court declaring preemption of the state use tax on non-gaming amenities. I concur in the court's reversal of the district court's judgment concerning the State's authority to condition renewal of the Tribe's alcoholic beverage license on the Tribe's remittance of use taxes that it was required to collect.

_____