# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BARONA BAND OF MISSION INDIANS,
also known as BARONA GROUP OF
CAPITAN GRANDE BAND OF MISSION
INDIANS; BARONA TRIBAL GAMING
AUTHORITY,
             *Plaintiffs-Appellees,*

             v.

BETTY T. YEE; BILL LEONARD;
CLAUDE PARRISH; JOHN CHIANG;
STEVE WESTLY, each in his or her
official capacity as a member of
the California State Board of
Equalization,
             *Defendants-Appellants.*

No. 06-55918

D.C. No.
CV-05-00257-DMS

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
February 7, 2008—Pasadena, California

Filed June 18, 2008

Before: Harry Pregerson, Glenn L. Archer, Jr.,* and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

*The Honorable Glenn L. Archer, Jr., Senior United States Circuit
Judge for the Federal Circuit, sitting by designation.

**COUNSEL**

Bill Lockyer, W. Dean Freeman, Domini Pham, Leslie Branam Smith, San Diego, California, for the appellants.

Art Bunce, Kathryn Clenney, Law Offices of Art Bunce, Escondido, California, for the appellees.

**OPINION**

WARDLAW, Circuit Judge:

We must decide whether a non-Indian contractor who purchases construction materials from non-Indian vendors, which are later delivered to a construction site on Indian land, is exempt from state sales taxes. The California State Board of Equalization (the "Board") appeals the grant of summary judgment in favor of the Barona Band of Mission Indians (the "Tribe") in which the district court determined that the balancing test set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), preempted a state sales tax lev-

ied against a non-Indian subcontractor performing electrical work on the Tribe's multi-million dollar casino expansion. Because the Tribe, as part of its highly lucrative gambling enterprise, merely marketed a sales tax exemption to non-Indians as part of a calculated business strategy, we conclude that its strategic effort to receive construction services from non-Indians at a competitive discount by circumventing the state sales tax does not outweigh California's interest in raising general funds for its treasury. The district court had jurisdiction under 28 U.S.C. § 1362, and we have jurisdiction pursuant to 28 U.S.C. § 1291.[1] We reverse and remand to the district court for further proceedings consistent with this opinion.

## I.   BACKGROUND

After nearly two centuries of displacement of the Barona Band of Mission Indians by European and then American encroachment, the United States enacted legislation to provide a tract of land in rural San Diego County to serve as a reservation for the Tribe. Until the early 1990s, however, the Tribe suffered from deep structural economic difficulties. Following the nationwide trend of Native Americans seeking to infuse economic life into depressed reservations, the Tribe opened up a casino in 1996: the Barona Valley Ranch Resort & Casino — "Where The Real Players Play, and Win."

By 2001, enough of these real players had played and lost for the Tribe to plan a $75 million expansion to the casino floor and hotel, replete with a new wedding chapel, parking

---

[1]Although the Board has not pursued on appeal its contention that we lack jurisdiction under the Tax Injunction Act, 28 U.S.C. § 1341, we must consider the issue sua sponte. Having done so, we agree with the district court that our courts have jurisdiction to entertain this action. Both the district court and we have jurisdiction because this is an appeal from an action by the Tribe under 28 U.S.C. § 1362 to challenge a state imposed tax. *See Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 474-75 (1976).

structure and other resort amenities. The Tribe entered into a lump sum contract with a general contractor, Hensel Phelps Construction Co. (the "prime contract") to construct the expansion. Under California law, a lump sum contract "means a contract under which the contractor for a stated lump sum agrees to furnish and install materials or fixtures, or both." Cal. Admin. Code tit. 18, § 1521(a)(8). Under the prime contract's terms, Hensel Phelps entered into a series of subcontracts with contractors in the various trades to complete discrete tasks. To that end, Hensel Phelps subcontracted with Helix Electric, Inc. to perform the expansion's electrical work.

As part of the prime contract terms, the Tribe touted a method it had devised to circumvent state sales tax, which would otherwise fall on the contractor, by scheduling deliveries to occur on tribal lands. Section 3.6.2 of the prime contract reads: "[Barona Band] is a federally recognized Indian Tribe and is therefore qualified for an exemption from California state sales and use tax on the purchase of tangible personal property if certain criteria are met. This Project is being structured, in accordance with Attachment O, to take advantage of the tax-exempt status of the [Tribe]." Attachment "O" to the prime contract carefully details the steps necessary for Hensel Phelps and its subcontractors to enjoy sales tax-free construction work. Under Attachment "O," Hensel Phelps and any subcontractor are designated as the Tribe's "purchasing agent for the procurement of Construction Supplies." The contractual language next provides a blueprint for the parties to follow in order to avoid state sales taxes. In bold lettering, Attachment "O" requires that any purchase made by Hensel Phelps and its subcontractors should only become officially consummated, with title transferring, on the Tribe's property.[2]

---

[2]Parties may not alter the substance of a transaction by inserting legal formalisms into contractual language. *See Northrop Corp. v. Bd. of Equalization*, 110 Cal. App. 3d 132, 142-43 (Cal. Ct. App. 1980) (holding that contract's claim that title would not pass could not defeat economic reality

All "shipping orders and delivery receipts," according to the contract, must include the following language:

**THIS SALE IS NOT COMPLETE, AND TITLE DOES NOT PASS, UNTIL DELIVERY IS ACCEPTED BY THE BUYER ON THE BARONA INDIAN RESERVATION.**

In a further effort to shield subcontractors from California state sales tax, the prime contract directs that the "Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered or stored at this site." Provided that Hensel Phelps and its subcontractors properly follow these steps, the Tribe promises to indemnify and defend them against any assessment of tax liability.

Under these terms, Helix Electric performed nearly four million dollars worth of sales-tax-free electrical work on the casino expansion. A Board-conducted audit concluded that Helix Electric owed slightly over $200,000 in sales and use tax emanating from purchases of construction materials—with title purporting to transfer on Tribe territory—from non-Indian vendors for use on the casino expansion. The Board issued a formal Notice of Determination to Helix demanding that it pay sales taxes in that amount. Helix Electric then sought indemnification from Hensel Phelps, which in turn sought reimbursement from the Tribe. The Tribe sued individual members of the Board in their official capacity in the United States District Court for the Southern District of California, seeking declaratory relief. The Tribe sought a judicial determination that the California state sales tax was invalid

---

that required appellant to remit sales tax to the state). On the record before us, it is unclear whether the economic realities of the subcontractors' work conformed to the advantageous assertions of title transfers contained in the contract. Nevertheless, we need not determine this factual matter to resolve the appeal before us.

(1) per se as a direct tax on the Tribe; (2) under the *Bracker* balancing test as a tax leveled against non-Indians on Indian territory; or (3) as preempted by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et seq.* ("IGRA"). The parties filed cross-motions for summary judgment and submitted a Joint Statement of Undisputed Material Facts.

While the district court disagreed that the tax was a *per se* improper tax levied against the Tribe, it did agree that the tax failed the *Bracker* balancing test and granted the Tribe's motion for summary judgment. The Board timely appeals.

## II.  DISCUSSION

### A.  *Per Se Invalidity*

Historically, the United States Supreme Court treated reservations as places where, in Chief Justice Marshall's words, the "laws of [a State] can have no force." *Worcester v. Georgia*, 6 Pet. 515, 561 (1832). This viewpoint, however, has softened over time, and the modern Court has "acknowledged certain limitations on tribal sovereignty." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331 (1983); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §§ 6.01-6.03 (2005) (outlining shift from traditional view of Indian sovereignty). Thus, Indian tribes and their possessions are akin to legal hybrids, "unique aggregations possessing attributes of sovereignty over both their members and their territory . . . retain[ing] any aspect of their historical sovereignty not 'inconsistent with the overriding interests of the National Government.' " *Mescalero*, 462 U.S. at 332 (citing *Washington v. Confederated Tribes*, 47 U.S. 134, 153 (1980)).

**[1]** The historically entrenched idea of tribal autonomy, however, remains central to our reasoning when confronted with the application of state laws on tribal territory. "[T]raditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an

important 'backdrop' against which vague or ambiguous federal enactments must always be measured." *Bracker*, 448 U.S. at 143 (internal citation omitted). A doctrine comparable, yet not identical, to federal preemption developed to protect tribes from State encroachment. *Id.* ("Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of preemption that are properly applied to the other."). Unlike traditional preemption, two conceptual barriers have been erected to block State law from regulating Indian behavior: federal enactments and Indian sovereignty. *See Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 837 (1982). Thus, "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *Mescalero*, 462 U.S. at 334.

[2] This legal framework has often required us to undertake careful balancing of various interests. *See Bracker*, 448 U.S. at 142 ("[T]here is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members."). Not so with state taxation of Indian tribes. "In the special area of state taxation of Indian tribes and tribal members, we have adopted a *per se* rule." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216 n.17 (1987). On the narrow question of whether a state can tax Indian activity on an Indian reservation, the law is clear. "[W]e adhere to settled law: when Congress does not instruct otherwise, a State's excise tax is unenforceable if its legal incidence falls on a Tribe or its members for sales made within Indian country." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 453 (1995).

The dispositive question for *per se* analysis is who the state is taxing and where. "[U]nder our Indian tax immunity cases, the 'who' and the 'where' of the challenged tax have significant consequences. We have determined that '[t]he initial and

frequently dispositive question in Indian tax cases . . . is *who* bears the legal incidence of [the] tax.' " *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005) (citing *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450 (1995)). The Court has instructed that lower courts seeking to determine the legal incidence of the taxation should look to the "fair interpretation of the taxing statute as written and applied." *California Bd. of Equalization v. Chemehuevi Tribe*, 474 U.S. 9, 11 (1985).

**[3]** The party bearing the legal incidence of a state tax may well differ from the party bearing the economic burden of that tax. For instance, under Attachment "O" to the prime contract, the Tribe will be the economically burdened party due to its promise to indemnify Hensel Phelps and Helix Electric for any state sales tax they are required to pay if the Board prevails. That the Tribe will pay the tax, however, does not resolve the question of who bears the tax's legal incidence. The Court has rejected an argument equating the two: "[O]ur focus on a tax's legal incidence accommodates the reality that tax administration requires predictability. . . . If we were to make 'economic reality' our guide, we might be obliged to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product." *Oklahoma Tax Comm'n*, 515 U.S. at 459-60.

**[4]** Therefore, we must examine the underlying California statutes to determine whether the legal incidence falls upon the Tribe, which would render the tax *per se* invalid, or Helix Electric, a non-Indian party beyond the categorical exemption from state taxation. As the district court correctly noted, "[u]nder California statutes and regulations, a construction contractor [Helix Electric] is the 'consumer' of materials furnished later to a client pursuant to a construction contract." "Either sales tax or use tax applies with respect to the sale of the materials to or the use of the materials by the construction

contractor." CAL. ADMIN. CODE tit. 18, § 1521(b)(2)(A)(1). Under CAL. ADMIN. CODE tit. 18, § 1521(a)(8), the "lump-sum" contract entered into by the parties falls within the taxing ambit of § 1521(b)(2)(A)(1). Thus, we agree with the district court that the legal incidence of the California sales tax, under the pertinent regulations, falls upon Helix Electric, a non-Indian party.

[5] The Tribe attempts an end-run around the "legal incidence" test by structuring its contract to designate subcontractors as "purchasing agents" for the tax-exempt Tribe. Along with the district court, we decline to extend the *per se* test, rooted in due respect for Indian autonomy, to provide tax shelters for non-Indian businesses. The parties may not alter the economic reality of a transaction—a subcontractor performing electrical work for a general contractor—to reap a windfall at the public's expense. "The incidence of taxation depends upon the substance of a transaction. . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of . . . tax policies." *See Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945). The legal incidence of the sales tax falls on Helix Electric, a non-Indian entity which purchased the construction materials, and the structuring of the expansion as set forth in Attachment O fails to *per se* exempt non-Indians from a valid state tax.

## B.   Bracker Balancing Test

[6] Without the convenience of a *per se* bright line test, we turn to the *Bracker* balancing test, developed for those "difficult questions . . . where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." *Bracker*, 448 U.S. at 144. The test calls for careful attention to the factual setting, requiring "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate fed-

eral law." *Id*. at 145. The factual sensitivity of the test means that " 'no rigid rule' governs such an exercise of state authority." *Red Mountain Machinery Co. v. Grace Inv. Co*., 29 F.3d 1408, 1410 (9th Cir. 1994). As an aid, however, "[t]he Supreme Court has identified a number of factors to be considered when determining whether a state tax borne by non-Indians is preempted, including: 'the degree of federal regulation involved, the respective governmental interests of the tribes and states (both regulatory and revenue raising), and the provision of tribal or state services to the party the state seeks to tax." *Salt River Pima-Maricopa Indian Community v. Arizona*, 50 F.3d 734, 736 (9th Cir. 1995) (citation omitted).

As a backdrop to the *Bracker* test, we note a parallel line of authority that aids in our analysis. The Court has previously expressed disfavor toward tribal manipulation of tax policy to gain "an artificial competitive advantage over all other businesses in a State." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155 (1980) (hereinafter, "Colville"). In *Colville*, Indian tobacco dealers, selling non-tribal products to non-Indians, sought tribal exemption from Washington State's tobacco excise tax in order to sell less expensive products to budget-minded customers willing to travel to the reservation for the savings. *Id*. at 145. The Court declined to extend the preemption doctrine to cloak the tribe's business practice. "What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation. . . . We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere." *Id*. at 155. We have understood *Colville* to support the principle that "[w]hen state taxes are imposed on the sale of non-Indian products to non-Indians, as . . . in the so-called 'smoke shop' cases, the preemption balance tips toward state interests." *Salt River Pima-Maricopa Indian Cmty.*, 50 F.3d at 737.

**[7]** Tribal interests are implicated by the imposition of the California tax on the construction work performed by Helix Electric on Tribal territory. The Tribe enjoys a right to autonomy within its territory, as noted in *Bracker* itself: "[T]here is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits." *Bracker*, 448 U.S. at 151. However, the right of territorial autonomy is significantly compromised by the Tribe's invitation to the non-Indian subcontractor to theoretically consummate purchases on its tribal land for the sole purpose of receiving preferential tax treatment. That these sophisticated parties contracted to create a taxable event on Indian territory which otherwise would occur on non-Indian territory factually distinguishes the present case from the multitude of cases where courts have analyzed state taxation on non-Indians performing work on Indian land. *See*, *e.g.*, *Bracker*, 448 U.S. at 137-38 (preempting Arizona's motor carrier license and use fuel taxes on non-Indian timber company entering Indian territory to fell trees planted on Indian territory); *Crow Tribe of Indians v. Montana*, 819 F.2d 895, 897 (9th Cir. 1987) (preempting Montana coal taxes against non-Indians mining coal located under reservation).

**[8]** It also appears that permitting the tax on Helix Electric may affect the overall profitability of the Tribe's casino operation. If the California sales tax is validated, the Tribe must, according to the contract, indemnify Helix Electric for over $200,000. This amount will be compounded by amounts paid to the other subcontractors, as well as Hensel Phelps. This alone, however, does not bar the imposition of a tax on non-Indians. *See Salt River Pima-Maricopa Indian Cmty.*, 50 F.3d at 737 ("[T]he Ninth Circuit and the Supreme Court have repeatedly held that 'reduction of tribal revenues does not invalidate a state tax.' "); *Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1116 (9th Cir. 1981) ("It is clear that a state

tax is not invalid merely because it erodes a tribe's revenues, even when the tax substantially impairs the tribal government's ability to sustain itself and its programs."). It is true that tribes have an interest in their economic self-sufficiency. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218 n.20 (1987) ("It is important to the concept of self-government that tribes reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government.") (citing 19 Weekly Comp. of Pres. Doc. 99 (1983)). However, this concern carries minimal weight in the context of a $75 million casino expansion, and where but for the contractual arrangement providing for indemnification by the Tribe, it would be Helix's revenues— and not the Tribe's —that would be reduced. Recognizing, moreover, that the legal incidence of the tax falls upon a non-Indian subcontractor, we find the tribal interests to be weak.

[9] The federal interests triggered by the tax are similarly minimal. Federal interests are greatest when the government's regulation of a given sphere is "comprehensive and pervasive." *Ramah*, 458 U.S. at 839. In *Ramah*, the Court found significant federal interests since "[t]he direction and supervision provided by the Federal Government for the construction of Indian schools le[ft] no room for the additional burden sought to be imposed by the State through its taxation." *Id*. at 841-42. The Court made a similar finding in *Bracker* regarding federal regulation of timber sales. *Bracker*, 448 U.S. at 145 ("At the outset we observe that the Federal Government's regulation of the harvesting of Indian timber is comprehensive."). This is contrasted with the degree of regulation found presently in IGRA. Through IGRA, Congress comprehensively regulates Indian gaming; however, California's tax is not on Indian gaming activity or profits, but rather on construction materials purchased by a non-Indian electrical subcontractor, which could be used for a multitude of purposes unrelated to gaming. Simply put, IGRA is a gambling regulation statute, not a code governing construction contractors, the legalities of which are of paramount state and local concern.

*Cf. Atchison, T & S.F. Ry. Co. v. Public Utilities Comm'n of Cal.*, 346 U.S. 346, 355 (1953) (noting that "the construction . . . of public streets is a matter peculiarly of local concern").

The federal government has a concomitant interest in the Tribe's economic self-sufficiency. As with the related tribal interest, the federal government's interest in Indian economic vitality does not alone defeat an otherwise legitimate state tax. *See Salt River Pima-Maricopa Indian Cmty.*, 50 F.3d at 739 ("The federal government has expressed an interest in assisting tribes in their efforts to achieve economic self-sufficiency. However, that interest does not, without more, defeat a state tax on non-Indians."). This interest continues to fade when the commercial activity is rigged to trigger a tax exemption. *See Colville*, 447 U.S. at 155 (noting that "a congressional concern with fostering tribal self-government and economic development [does] not go so far as to grant tribal enterprises selling goods to nonmembers an artificial competitive advantage over all other businesses in a State"). Moreover, as noted with the related tribal interest, our concern with self-sufficiency necessarily lessens in the specific context of a multi-million dollar casino expansion.

**[10]** We agree with the Board that the *Bracker* analysis tips in its favor where the state levies a neutral sales tax on non-Indians' purchases which—but for contractual creativity— would have occurred on non-Indian land. In these circumstances, we find the state interest in the application of its general sales tax to be greater than the combined federal and tribal interests. Raising revenue to provide general government services is a legitimate state interest. *See Crow Tribe of Indians*, 650 F.2d at 1113 ("Of course, revenue raising to support government is a proper purpose behind most taxes."); *Salt River Pima-Maricopa Indian Cmty.*, 50 F.3d at 737 ("The state also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services."). We recognize that the state

interest strengthens where there is a nexus between the taxed activity and the government function provided, and that such a nexus is not found here. *See Ramah*, 458 U.S. at 843. Nevertheless, the state has a parallel interest in preventing the manipulation of its tax laws to aid a casino in shopping tax exemptions to local businesses who otherwise would remit sorely needed revenue to the state. In the precise factual context presented here, the general state interests of revenue raising and consistent application of its tax laws trump the weak interests of the Tribe and federal government. We conclude that California's tax of Helix Electric is a valid exercise of state power under the *Bracker* test.

## C. Preemption by IGRA

[11] The Tribe also contends that the California sales tax on the construction equipment used by Tribal subcontractors has been directly preempted by IGRA. We agree, however, with the Board that IGRA's comprehensive regulation of Indian gaming does not occupy the field with respect to sales taxes imposed on third-party purchases of equipment used to construct the gaming facilities.[3] IGRA's core objective is to regulate how Indian casinos function so as to "assure the gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(2). Extending IGRA to preempt any commercial activity remotely related to Indian gaming—employment contracts, food service contracts, innkeeper codes—stretches the statute beyond its stated purpose.[4]

---

[3]The Tribe points with approval to 25 U.S.C. § 2710(d)(4), which states that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe." However, as discussed above, the tax in question has been imposed upon the non-Indian outfit Helix Electric and not on the Tribe itself.

[4]We agree with the Board that the compact entered into by the Tribe and the State does not bear on our analysis here. *See In re Indian Gaming Related Cases*, 147 F.Supp.2d 1011, 1018 (N.D. Cal. 2001) ("States cannot insist that compacts include provisions addressing subjects that are only indirectly related to the operation of gaming facilities."). The question before us is properly framed as a tax levied on a non-Indian tribe, and therefore falls outside the scope of the compact.

The Court has developed the *Bracker* test to determine whether federal interests preempt state taxes. If we were to accept the Tribe's argument that IGRA itself preempts the state taxation of non-Indian contractors working on tribal territory, we would effectively ignore *Bracker* and its progeny. The Court has provided an analytical framework to resolve this question, which we must apply here.

## III.    CONCLUSION

Because the legal incidence of the California sales tax falls upon the non-Indian subcontractor, we agree with the district court's holding that the tax passes muster under the *Chickasaw Nation per se* test. 515 U.S. at 453. We disagree, however, that the *Bracker* preemption test invalidates the state tax where the Tribe has invited commercial activity onto its territory for the purpose of marketing a sales tax exemption to non-Indian businesses who would otherwise be liable for the state tax under laws of general applicability. We therefore reverse the district court's grant of summary judgment to the Tribe, and remand for judgment to be entered in favor of the members of the California State Board of Equalization.

**REVERSED AND REMANDED.**