VIDEO GAMING TECHNOLOGIES v. ROGERS COUNTY BD. OF TAX ROLL CORRECTIONS



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:VIDEO GAMING TECHNOLOGIES v. ROGERS COUNTY BD. OF TAX ROLL CORRECTIONS

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 VIDEO GAMING TECHNOLOGIES v. ROGERS COUNTY BD. OF TAX ROLL CORRECTIONS
2019 OK 83
Case Number: 117491
Decided: 12/17/2019
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2019 OK 83, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

VIDEO GAMING TECHNOLOGIES, INC., Plaintiff/Appellant,
v.
ROGERS COUNTY BOARD OF TAX ROLL CORRECTIONS, a Political Subdivision; CATHY PINKERTON BAKER, ROGERS COUNTY TREASURER, in Her Official Capacity; and SCOTT MARSH, ROGERS COUNTY ASSESSOR, in HIS Official Capacity, Defendants/Appellees.

ON APPEAL FROM THE DISTRICT COURT OF ROGERS COUNTY,
STATE OF OKLAHOMA
HONORABLE SHEILA A. CONDREN, DISTRICT JUDGE

¶0 Plaintiff brought claims for relief from assessment of ad valorem taxes on electronic gaming equipment owned by Plaintiff and leased to the Cherokee Nation through its business entity. Both parties sought summary judgment. The district court rendered summary judgment in Defendant's favor, finding that ad valorem taxes were not preempted. We retained Plaintiff's appeal.

ORDER OF THE DISTRICT COURT IS REVERSED, 
CAUSE REMANDED.

Elizabeth A. Price and Kurt M. Rupert, Hartzog Conger Cason & Neville, and Kevin B. Ratliff, Ratliff Law Firm, Oklahoma City, OK for Appellant.

Matthew J. Ballard, District Attorney, Rogers County District Attorney's Office, Claremore, OK, for Appellee.

OPINION

DARBY, V.C.J., 

¶1 On appeal, Video Gaming Technologies, Inc. ("VGT"), Plaintiff/Appellant, contends that the district court improperly granted summary judgment to Rogers County Board of Tax Roll Collections ("Board"), the Rogers County Treasurer, and the Rogers County Assessor, Defendants/Appellees (together "County"). The questions before this Court are whether the district court properly denied VGT's motion for summary judgment and properly granted County's counter-motion for summary judgment. We answer both in the negative.

I. STANDARD OF REVIEW

¶2 Summary judgment settles only questions of law, therefore, we review de novo the grant thereof. Am. Biomedical Grp. v. Techtrol, Inc., 2016 OK 55, ¶ 2, 374 P.3d 820, 822. "Summary judgment will be affirmed only if the appellate court determines that there is no dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Horton v. Hamilton, 2015 OK 6, ¶ 8, 345 P.3d 357, 360; see also 12 O.S.2011, § 2056(C). Under this standard, we confine our review to the limited, undisputed, material facts. Techtrol, 2016 OK 55, ¶ 3, 374 P.3d at 823. We do not consider County's factual allegations included in its paperwork that County failed to designate as disputed or undisputed material facts or support with evidentiary materials in the district court. See id.; see also Frey v. Independence Fire and Cas. Co., 1985 OK 25, ¶ 6, 698 P.2d 17, 20

II. PROCEDURAL HISTORY

¶3 In December 2012, VGT filed a complaint with Board protesting the 2011 and 2012 assessment of ad valorem taxes. VGT claimed the electronic gaming equipment it leased exclusively to Cherokee Nation (Nation) for gaming was preempted from taxation under federal law. At that time, VGT submitted a copy of Mashantucket Pequot Tribe v. Town of Ledyard (Mashantucket I), No. 3:06CV1212(WWE), 2012 WL 1069342 (D. Conn. Mar. 27, 2012) (finding preemption of imposition of ad valorem tax on gaming equipment), rev'd, 722 F.3d 457 (2d Cir. 2013). In December 2013, VGT timely filed a complaint with Board protesting the 2013 ad valorem tax assessments for the same reason. In April 2014, Board denied VGT's complaints by letter.

¶4 VGT timely appealed Board's decision, filing a petition for review in Rogers County District Court. VGT sought summary judgment claiming federal preemption of ad valorem taxes under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721 (2018), Indian Trader Statutes, and federal case law. VGT set forth a list of undisputed material facts which it supported with declarations[1] from VGT's Assistant General Counsel and an attorney for Nation; it also attached copies of its 2012 and 2013 complaints and Board's 2014 denial letter.

¶5 County filed a response and counter-motion for summary judgment, urging that ad valorem taxation of the property was not preempted or barred. County declared that "the relevant facts in this case are not in dispute," making summary judgment appropriate. County then set out its own statement of undisputed material facts. Later in its counter-motion for summary judgment and response, County argued:

VGT has not alleged or provided evidence that it actually passes off the costs of its taxes onto the Tribe, but merely asserts a vague notion that its lease agreements are "based upon a variety of competing economic factors" and include costs that are "balanced to arrive at the lease terms." This bald assertion supposedly supports VGT's contention that the economic burden caused by the taxes would ultimately fall on the Tribe, but VGT has advanced no evidence that this is actually the case.

Def't's Resp. to VGT's Mot. for S.J., Counter-Mot. for S.J., and Br. in Supp., filed May 31, 2018, at 10. County, however, failed to support this assertion with any evidence to dispute the evidence put forth by VGT. County attached a copy of Mashantucket Pequot Tribe v. Town of Ledyard (Mashantucket II), 722 F.3d 457 (2d Cir. Jul. 15, 2013) (reversing Mashantucket I and finding no preemption), an affidavit from the Rogers County Assessor, copies of the complaints and denial, and a statement of the taxes currently assessed against VGT.

¶6 On September 27, 2018, the district court denied VGT's motion and sustained County's counter-motion for summary judgment. The district court found the rationale in Mashantucket II persuasive and held that the "State of Oklahoma's ad valorem tax statutes are not preempted or barred by the Indian Trader Statutes, the Indian Gaming Regulatory Act, or pursuant to the balancing test set forth by the United States Supreme Court in White Mountain Apache Tribe v. Bracker," 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980). VGT timely appealed under Oklahoma Supreme Court Rule 1.36 and filed a motion that we retain the appeal, which we granted. On appeal, VGT argues that the district court erred in (1) relying on Mashantucket II to grant County's counter-motion for summary judgment and (2) failing to grant VGT's motion for summary judgment because imposition of ad valorem taxes is preempted by IGRA and the Bracker balancing test.

III. UNDISPUTED MATERIAL FACTS

¶7 VGT is a non-Indian Tennessee corporation authorized to do business in Oklahoma. VGT owns and leases electronic gaming equipment to Cherokee Nation Entertainment, LLC (CNE), a business entity of Nation. Nation is a federally-recognized Indian tribe headquartered in Tahlequah, Oklahoma. CNE owns and operates ten gaming facilities on behalf of Nation.

¶8 CNE and VGT negotiated and executed their initial lease agreement, and all subsequent amendments, on tribal trust land. The lease agreements are based on a variety of competing economic factors and include consideration of several costs that are balanced to arrive at the lease terms. The equipment lease agreement states that VGT supplies the gaming equipment, software, and related services to CNE. The gaming equipment that VGT leases to CNE is located on tribal trust land in Rogers County and is essential to Nation's gaming operations.

¶9 The Rogers County Assessor assesses ad valorem tax on business personal property located in the county on the first of the year, pursuant to title 68, section 2831 of the Oklahoma Statutes.[2] In 2011, 2012, and 2013, County assessed ad valorem taxes on the gaming equipment owned by VGT.[3] County based its assessment on the value of the property and did not take into consideration use, possession, or specific location of the property.

¶10 Tax revenue from ad valorem assessments, like those imposed on VGT's gaming equipment, help fund the operation of Rogers County government, schools, law enforcement, health services, roads, and other government services within Rogers County. The economic burden caused by the assessment of ad valorem taxes, however, would ultimately fall on Nation because it would impact the overall costs of providing the gaming machines to Nation and therefore the price for which VGT would agree to lease them.

IV. ANALYSIS

¶11 VGT argues that taxation of its gaming equipment is preempted by IGRA and Bracker because the property is located on tribal trust land under a lease to Nation for use in its gaming operations.

A. Federal Preemption of Taxation of Non-Indians on Indian Land

¶12 The location of property on tribal trust land is not a per se bar to taxation because the legal incidence of the ad valorem tax falls on the non-Indian lessor, not on Nation. Okla. Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 453, 459, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995); State ex rel. Edmondson v. Native Wholesale Supply, 2010 OK 58, ¶ 39, 237 P.3d 199, 212-213. When a state or county seeks to impose a nondiscriminatory tax on non-Indians on tribal land, there is no rigid preemption rule, rather we must apply a flexible analysis to determine if taxation is proper. See Bracker, 448 U.S. 136; see also Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M., 458 U.S. 832, 102 S. Ct. 3394, 73 L. Ed. 2d 1174 (1982); see also Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 109 S. Ct. 1698, 104 L. Ed. 2d 209 (1989). Courts must perform a "particularized examination of the relevant state, federal, and tribal interests" which is not controlled by standards of preemption from other areas of law. Ramah Navajo School Bd., 458 U.S. at 838; see also Bracker, 448 U.S. at 142, 144-45.

¶13 In examining federal treaties and statutes, we must look to congressional intent to preempt state taxation of non-Indians on tribal land, while considering the broad underlying policies and history of tribal sovereignty as a "backdrop." Cotton Petroleum, 490 U.S. at 176; see also Bracker, 448 U.S. at 142, 144-45. Preemption is not limited to cases in which Congress has expressly preempted the state tax. Cotton Petroleum, 490 U.S. at 176-77. The county seeking to impose a tax on non-Indians on tribal land must be able to identify regulatory functions or services the county performs to justify the assessment--interest in raising revenues is not enough. Bracker, 448 U.S. at 148-49, 150. Courts must follow the guiding principle to construe "federal statutes and regulations relating to tribes and tribal activities" generously in order to comport with "traditional notions of sovereignty and with the federal policy of encouraging tribal independence." Ramah Navajo Sch. Bd., 458 U.S. at 846; Bracker, 448 U.S. at 143--44.

¶14 In Bracker, the U.S. Supreme Court looked to the comprehensive and pervasive nature of the federal regulation of harvesting timber, the number of policies underlying the federal scheme which were threatened by state regulation, the tribe's sovereignty over their land, the fact that it was undisputed that the economic burden would ultimately fall on the tribe, and the state's inability to identify any regulatory function or service the state performed that would justify the taxes except a generalized interest in raising revenue. Id. at 145-51. Ultimately, the Court found preemption of state motor carrier license and use fuel taxes on a non-Indian logging company's activities on Indian land. Id. at 151.

¶15 Two years later, the U.S. Supreme Court applied that analysis before finding preemption of a state gross-receipts tax imposed on a non-Indian contracting firm constructing school facilities on tribal land. Ramah Navajo Sch. Bd., 458 U.S. 832. The Court determined federal regulations regarding construction of Indian schools were both comprehensive and pervasive. Id. at 839-42. The Court noted that while the burden nominally fell on the non-Indian contractor, it impeded the clearly expressed federal interests by depleting the funds available for construction. Id. at 842. The Court again found the state's ultimate justification was a desire to increase revenue, without showing a specific, legitimate regulatory interest to justify the imposition of the tax. Id. at 843-845.

¶16 In 1989, the U.S. Supreme Court found a non-Indian lessee oil and gas company was subject to severance taxes from both the tribe and the state for minerals extracted from their leases on Indian land. Cotton Petroleum, 490 U.S. at 168-69. The Court considered the history of the State's ability to tax non-Indian lessee's on-reservation oil production as well as one of the purposes of the act being to provide tribes with "badly needed revenue, but [found] no evidence . . . that Congress intended to remove all barriers to profit maximization." Id. at 173, 180. The Court determined that the state also regulated the field, the state provided substantial services to the tribe and the company in question, and there was no economic burden on the tribe from the company's payment of taxes. Id. at 185-86.

¶17 The Court distinguished the case from Bracker and Ramah Navajo School Board because the other cases "involved complete abdication or noninvolvement of the State in the on-reservation activity." Id. at 185. The Court determined that there is no proportionality requirement to the justification of taxes for States compared to the services provided. Id. The Court acknowledged that the taxes had a "marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate," but found that any impairment to the federal policies in play was too indirect and insubstantial to support claims of preemption. Id. at 187

B. Federal IGRA Case Law

¶18 In 2001, the Eighth Circuit analyzed IGRA's preemption of state law claims in a dispute between a non-Indian general contractor and non-Indian sub-contractor. Casino Res. Corp. v. Harrah's Entm't, Inc., 243 F.3d 435, 439 (8th Cir. 2001). Resolution of the dispute required review of a contract terminating a gaming management arrangement between one of the parties and a tribal entity. Id. at 438. The Eighth Circuit noted that "[n]ot every contract that is merely peripherally associated with tribal gaming is subject to IGRA's constraints." Id. at 439. The court held that "[i]t is a stretch to say that Congress intended to preempt state law when there is no valid management contract for a federal court to interpret, when the Nation's broad discretion to terminate management contracts is not impeded, and when there is no threat to the Nation's sovereign immunity or interests." Id. at 440.

¶19 In 2008, the Ninth Circuit addressed whether IGRA preempted state sales tax on construction materials purchased by a non-Indian sub-contractor from a non-Indian vendor and delivered to Indian land for casino construction. Barona Band of Mission Indians v. Yee, 528 F.3d 1184, 1186 (9th Cir. 2008). The court weighed heavily the parties' attempt to manipulate tax laws and noted that the taxed materials "could be used for a multitude of purposes unrelated to gaming." Id. at 1191-93. The court found that "IGRA's comprehensive regulation of Indian gaming does not occupy the field with respect to sales taxes imposed on third-party purchases of equipment used to construct gaming facilities." Id. at 1193.

¶20 In 2013, the Second Circuit determined ad valorem taxation on gaming equipment was not preempted by IGRA. Mashantucket II, 722 F.3d at 470. The court compared the ad valorem tax on gaming equipment to Barona Band and Casino Resource, where the generally-applicable laws were not preempted by IGRA's occupation of the governance of the gaming field, but were merely peripherally associated. 722 F.3d at 470. The court found that "mere ownership of slot machines by the vendors does not qualify as gaming, and taxing such ownership therefore does not interfere with the 'governance of gaming.'" Id. (emphasis original).

¶21 In its Bracker analysis, the Mashantucket II court stated that "[n]othing within IGRA reveals congressional intent to exempt non-Indian suppliers of gaming equipment from generally applicable state taxes that would apply in the absence of the legislation." 722 F.3d at 473. The court determined that "IGRA presented an opportunity for Congress to preempt taxes exactly like this one; Congress chose to limit the scope of IGRA's preemptive effect to the 'governance of gaming.'" Id. (quoting Gaming Corp. of Am. v. Dorsey, 88 F.3d 536, 550 (8th Cir. 1996)). The court concluded:

We recognize that this is arguably a close case. However, the Tribe's generalized interests in sovereignty and economic development are not significantly impeded by the State's generally-applicable tax; neither are the federal interests protected in IGRA. The Town has moderate economic and administrative interests at stake, and the affront to the State's sovereignty on one hand approximates the affront to the Tribe's sovereignty on the other. The balance of equities here favors the Town and State.

Mashantucket II, 722 F.3d at 476--77.

¶22 In 2014, the United States Supreme Court considered whether a tribe's off-reservation gaming activities were covered under IGRA. Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014). The Court noted that "numerous provisions of IGRA show that 'class III gaming activity' means just what it sounds like--the stuff involved in playing class III games." Bay Mills, 572 U.S. at 792. The Court noted multiple phrases in IGRA that "make perfect sense if 'class III gaming activity' is what goes on in a casino--each roll of the dice and spin of the wheel"--and together signify that the "gaming activity is the gambling in the poker hall not the proceedings of the off-site administrative authority." Id. The Court explained that two sections of IGRA describe the "power to 'clos[e] a gaming activity' for 'substantial violation[s]' of law--e.g., to shut down crooked blackjack tables, not the tribal regulatory body meant to oversee them." Id.

¶23 Since Bay Mills, the Tenth Circuit addressed the question of jurisdiction over tort claims arising out of IGRA. Navajo Nation v. Dalley, 896 F.3d 1196, 1200 (10th Cir. 2018), cert. denied sub nom. McNeal v. Navajo Nation, 139 S. Ct. 1600, 203 L. Ed. 2d 755 (2019). The court concluded that "Class III gaming activity relates only to activities actually involved in the playing of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike." 896 F.3d at 1207. The court found that actions arising in tort are not "directly related to, and necessary for, the licensing and regulation of [gaming] activity." Id. at 1207, 1209. The court clarified that the licensing or regulation of gaming activity "does not relate to claims arising out of occurrences that happen in proximity to--but not as a result of--the hypothetical card being dealt or chip being bet." Id. at 1209 (citation omitted).[4]

¶24 Recently, the Eighth Circuit again addressed IGRA in two cases issued the same day. Flandreau Santee Sioux Tribe v. Noem, 938 F.3d 928 (8th Cir. 2019); Flandreau Santee Sioux Tribe v. Haeder, 938 F.3d 941(8th Cir. 2019). The court determined in Noem that IGRA preempted the state's imposition of a use tax on non-Indian purchases of amenities at a casino. Noem, 938 F.3d at 937. In Haeder, the court determined that IGRA did not preempt an excise tax on gross receipts of a non-Indian contractor for services performed in renovating and expanding a casino. Haeder, 938 F.3d at 942, 947.

¶25 The Eighth Circuit stated that the phrase "[d]irectly related to the operation of gaming activity" is narrower than "directly related to the operation of the Casino." Noem, 938 F.3d at 935. The court thus determined that sale of amenities is not "directly related to the operation of gaming activities" in order to be expressly preempted. Id. But the court found that while the amenities are not directly related to the operation of gaming activities, they do contribute significantly to the economic success of the tribe's class III gaming operation. Id. at 936. The court noted that the state's taxation of amenities would raise the cost--potentially reducing tribal revenues and detrimentally impacting IGRA's policies. Id. In affirming the preemption of state use tax on non-Indian purchases of amenities at the casino, the court found:

[t]he State's interest in raising revenues to provide government services . . . does not outweigh the federal and tribal interests in Class III gaming reflected in IGRA and the history of tribal independence in gaming recognized in Cabazon. As in Bracker, "this is not a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall."

Id. at 937.

¶26 In Haeder, the court considered a provision in IGRA requiring National Indian Gaming Commission (NIGC) approval of a tribal ordinance stating that casino construction would adequately protect the environment, public health, and safety--but noted that the NIGC does not regulate construction activity or prescribe what adequate protection requires. Haeder, 938 F.3d at 945. The court concluded that the provision did not preempt the state contractor excise tax, "a tax which does not regulate or interfere with the Tribe's design and completion of the construction project, or its conduct of Class III gaming." Id. The court further noted that, unlike the ongoing casino amenities tax in Noem, the contractor excise tax is a one-time tax which "hardly implicates the relevant federal and tribal interests." Haeder, 938 F.3d at 946. The court also found that because the tax did not regulate casino construction or gaming activities, there were no implications to the federal and tribal interests in IGRA. Id. Regarding the state's interests, the court noted that the relevant services provided included those available to the contractor and the members of the tribe on and off-reservation. Id. at 947.

C. Bracker Analysis of Ad Valorem Tax on Gaming Equipment

¶27 In the present case, we must (1) look to the comprehensiveness of the federal regulations in place, in light of the broad underlying policies and notions of sovereignty in the area; (2) consider the number of policies underlying the federal scheme which are threatened; and (3) determine if the state is able to justify the tax other than as a generalized interest in raising revenue. See Bracker, 448 U.S. at 142, 144-45.

1) Comprehensive Legislation

¶28 IGRA was "intended to expressly preempt the field in the governance of gaming activities on Indian lands." S.Rep.100-446 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076. In creating IGRA, Congress recognized that the extension of State jurisdiction to Indian lands has traditionally been inimical to Indian interests and attempted to balance the need for sound enforcement of gaming laws and regulations with the strong federal interest in preserving sovereign rights of tribal governments to regulate activities and enforce laws on Indian lands. Id. at 3075. Congress found:

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

25 U.S.C. § 2701.

¶29 Congress adopted IGRA in 1988 to provide for the operation and regulation of gaming by Indian tribes. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 48, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996). IGRA divides gaming on Indian lands into three classes, and it provides a different regulatory scheme for each one. Id. Class II gaming is bingo, electronic or otherwise, and card games that are either explicitly authorized by the State or not explicitly prohibited and are played elsewhere in the State. 25 U.S.C. § 2703(7). Class III gaming is heavily regulated and is defined as all gaming which is not included in class I or II; it includes slot machines, electronic games of chance, casino games, banking card games--such as baccarat, chemin de fer, or blackjack--and others. Seminole Tribe, 517 U.S. at 48; 25 U.S.C. § 2703(7)(B),(8).

¶30 Congress declared IGRA's purpose included providing regulation from corrupting influences, ensuring the tribe is the primary beneficiary of the operation, and assuring that gaming is conducted fairly and honestly, by both operator and players. 25 U.S.C. § 2702.[5] In accordance with that, IGRA provided comprehensive guidance on gaming. IGRA mandates that tribes may only conduct Class III gaming when the tribe adopts an ordinance or resolution that satisfies certain statutorily prescribed requirements and it is conducted in accordance with a negotiated Tribal-State compact. Seminole Tribe, 517 U.S. at 49; 25 U.S.C. § 2710(d)(1).[6] The State is able to assess necessary amounts under the compact in order to defray associated regulation costs for Class III gaming. Id. § 2710(d)(3). Although Nation's compact with the State is not part of the record, the model state compact provides extensive regulation requiring inspection of gaming equipment to ensure the gaming is conducted fairly and honestly. 3A O.S.2011, § 281 Part 4(B), 5(C),(M), 8(A). It also mandates that companies that lease over twenty-five thousand dollars a year of equipment to a tribe must be licensed by the tribal compliance agency, and requires payment of annual assessments for oversight of the gaming equipment. Id. Part 10(B)(1), 11(B).

¶31 IGRA also established the NIGC and gave it power to close gaming activities; adopt regulations for, levy, and collect civil fines; establish the rate of fees; approve tribal ordinances or resolutions regulating class II and III gaming; and approve management contracts. 25 U.S.C. §§ 2703-06, 2710-11, 2713. The NIGC also has power to establish fees to be paid by each "gaming operation that conducts . . . a class III gaming activity that is regulated by this chapter." Id. § 2717(a). IGRA allows a tribe to adopt a resolution and submit it to the Commission to "authorize any person or entity to engage in, a class III gaming activity on Indian lands of the Indian tribe." Id. § 2710(d)(2)(A). IGRA further requires independent audits for contracts related to Class II or III gaming for supplies, services, or concessions in contracted amounts in excess of $25,000 annually. Id. § 2710(b)(2)(D),(d)(1)(A)(ii).

i) Gaming Equipment versus Gaming Activity

¶32 We find IGRA's regulations governing gaming are comprehensive and pervasive. Before we go further in the analysis, however, we must first address whether for purposes of IGRA there is a difference in owning gaming equipment used exclusively for tribal gaming versus engaging in gaming activity. IGRA itself does not expressly distinguish the game from the equipment on which it is played. Nor has the U.S. Supreme Court. While Bay Mills focused on the action rather than the equipment--describing gaming as the "act of throwing the dice"--it is clear that regulation of gaming equipment is encompassed under IGRA in order to prevent corruption. If regulation of traditional gaming equipment, such as preventing crooked blackjack tables, is necessary--regulation of electronic gaming equipment, which has much greater potential for abuse, seems that much more important.

¶33 IGRA was clearly intended to provide oversight of gaming equipment to prevent corruption. But, the Second Circuit determined that gaming equipment is somehow peripheral or tangential to gaming and thus distinguished gaming equipment from gaming in order to find taxation of its ownership was not governed by IGRA's express preemption of the field of "governance of gaming." The Second Circuit also confused the Bracker analysis when it stated that "[w]hile IGRA seeks to limit criminal activity at the casinos, nothing in Connecticut's tax makes it likely that Michael Corleone will arrive to take over the Tribe's operations." Mashantucket II , 722 F.3d at 473. The fact that the specific tax in question does not infringe on a purpose of IGRA, does not remove the applicable stated purpose of IGRA or its importance.

¶34 Unlike Barona Band, the gaming equipment in this location cannot be used for anything but gaming. Barona Band, 528 F.3d at 1191-93. The ad valorem tax would not apply to this gaming equipment in the absence of IGRA, because the gaming equipment is only located in Rogers County due to its use in Indian gaming activities. And prior to IGRA, mere possession of the gaming equipment on tribal trust land would have been illegal. See 15 U.S.C. § 1175(a) (2018).

¶35 Mashantucket II held that "this is arguably a close case," 722 F.3d at 476, however, we disagree. Here, the ad valorem tax is assessed against the owner of property located in the county. Focusing only on the ownership of the property separate from the property itself--especially in this case where the property would not be located in the county but for its possession by Nation for its exclusive leased use in Indian gaming--would be incongruous with Bracker and its progeny. While ownership of gaming equipment does not automatically subject it to IGRA, when the gaming equipment is used exclusively in a tribal gaming operation, such as with Nation, we find it is inextricably intertwined with IGRA gaming activities such that it is absolutely directly related to and necessary for the licensing and regulation of gaming activity. See Dalley, 896 F.3d at 1207.

¶36 Mashantucket II also ignored the U.S. Supreme Court's guidance that courts should err toward Indians on questions of preemption. Ramah Navajo Sch. Bd., 458 U.S. at 846; Bracker, 448 U.S. at 143--44. Unlike the situations in Casino Resource and Barona Band, gaming equipment is not tangential to gaming. Rather, it is a sine qua non of gaming. Due to the United States Supreme Court's clear comments about the nature of gaming activities, and the Court's clear guidance to construe federal statutes relating to tribal activity generously, we find Mashantucket II unpersuasive.

2) Federal Policies Threatened by Ad Valorem Taxation of Gaming Equipment

¶37 It is an undisputed fact that the burden of the ad valorem taxes will ultimately fall on Nation. Due to the success of Nation's gaming enterprise, the passed on cost will not threaten the purpose of Nation being the primary beneficiary of the gaming operation. Title 68, section 3104 of the Oklahoma statutes, however, allows County to seize property when ad valorem taxes are not paid. 68 O.S.2011, § 3104. Thus, County's remedy for collection of delinquent taxes would directly affect the tribe, impact its gaming operation, and severely threaten the policies behind IGRA--including Nation's sovereignty over its land. See Wyandotte Nation v. Sebelius, 443 F.3d 1247 (10th Cir. 2006) (tribal sovereignty outweighs a state's interest in enforcing its laws to the extent of intruding onto tribal land and seizing casino equipment, files, and proceeds).

3) County's Justification for Taxation

¶38 County argues that ad valorem taxation is justified to ensure integrity and uniform application of tax law. County also justifies the tax by claiming, without additional supporting evidence, that the money is vital to them. County further states that the disputed taxes fund services it provides to the county at large.

¶39 County does not regulate gaming or gaming equipment in any way. Unlike Cotton Petroleum, County has not shown it provides any regulatory functions or services to VGT, the out-of-state company, to justify its taxation of equipment which is only located in Rogers County for use in Nation's gaming enterprise. See Cotton Petroleum, 490 U.S. at 185-186; see also Bracker, 448 U.S. at 148-49. Like Ramah Navajo School Board, it appears that County's interest is primarily raising revenue without providing specific regulatory functions or services to justify it. Ramah Navajo Sch. Bd., 458 U.S. at 843-45. The U.S. Supreme Court has said that desire for increased revenue is not enough, instead basing justification on what the state or county provides to the entity in exchange for taxation. Bracker, 448 U.S. at 150. County has not shown any nexus between the services it provides through ad valorem taxation and services that VGT receives on-or-off tribal land. County's provision of services to other members of the county does not justify imposition of the tax which burdens the federal interests in IGRA. See Ramah Navajo Sch. Bd., 458 U.S. at 844. Like Bracker, "this is not a case in which the [County] seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall." Bracker, 448 U.S. at 150.

¶40 County's argument regarding uniform application of the law also fails; Oklahoma also already has use exemptions for ad valorem taxation that require County to consider property use in certain circumstances. Okla. Const. art. 10, § 6; 68 O.S.2011, §§ 2887, 2889; State ex rel. Cartwright v. Dunbar, 1980 OK 15, ¶10, 618 P.2d 900, 904-905 (use is the determinative factor for questions of exemption from ad valorem taxes for religious or charitable question use) (quoting State ex rel. City of Tulsa v. Mayes Cty. Treasurer, 1935 OK 1027, ¶ 36, 51 P.2d 266); Okla. Indus. Auth. v. Barnes, 1988 OK 98, ¶ 16, 769 P.2d 115, 120. Further, there are other statutory considerations of use for determination of fair market value for taxation. See 68 O.S.2011, § 2817. Requiring County to consider use in this situation is not an unfair burden on its enforcement of tax laws.

¶41 Gaming equipment is not peripheral to gaming. Based off the U.S. Supreme Court's interpretation of gaming in IGRA and its further admonishment to interpret federal statutes regarding tribes generously, we find that gaming equipment is a sine qua non for gaming and thus under IGRA. The comprehensive regulations of IGRA occupy the field with respect to ad valorem taxes imposed on gaming equipment used exclusively in tribal gaming. The state remedy for non-payment also acts as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress. See Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992). Due to the comprehensive and pervasive nature of IGRA, the number of federal policies threatened, Nation's sovereignty, and County's lack of justification other than as a generalized interest in raising revenue, we find that taxation of gaming equipment used exclusively in tribal gaming is preempted.

V. CONCLUSION

¶42 Summary judgment is only affirmed if there is no dispute as to any material fact and the party is entitled to judgment as a matter of law. The district court erred in relying on Mashantucket II and not considering the more recent guidance of the U.S. Supreme Court in Bay Mills. Based on this erroneous conclusion of law, we find summary judgment against VGT was improper.

¶43 Due to the comprehensive nature of IGRA's regulations on gaming, the federal policies which would be threatened, and County's failure to justify the tax other than as a generalized interest in raising revenue, we find that ad valorem taxation of gaming equipment here is preempted. We reverse the order of summary judgment and we remand the matter to the district court to enter an appropriate order of summary judgment for VGT.

ORDER OF THE DISTRICT COURT IS REVERSED, 
CAUSE REMANDED.

Gurich, C.J., Darby, V.C.J., Kauger, Winchester, Edmondson, Colbert and Combs, JJ. -- concur

Kane, J. -- not voting

FOOTNOTES

[1] An unsworn declaration, signed under penalty of perjury, may be used in place of an affidavit. 12 O.S.2011, § 426.

[2] A. All property, both real and personal, having an actual, constructive or taxable situs in this state, shall, except as hereinafter provided, be listed and assessed and taxable in the county, school districts, and municipal subdivision thereof, where actually located on the first day of January of each year . . . .

68 O.S.2011, § 2831(A).

[3] VGT was assessed and paid ad valorem taxes on the gaming equipment from 2005-2010. The Rogers County Assessor has continued to assess ad valorem tax on VGT's gaming equipment since 2013 and VGT has continued to file complaints for all further ad valorem taxes. Board has not taken any action on the further complaints while awaiting the outcome of this matter.

[4] In a footnote, the court noted that someone could potentially incur an injury from the gaming activity itself. Navajo Nation v. Dalley, 896 F.3d 1196, 1210 n.7 (10th Cir. 2018).

Consider, for example, a casino patron at a roulette table: during the course of the game, an errant ball flies and hits the patron in the eye, causing damage to the patron. Or, in a different situation, a patron is playing on a dysfunctional slot machine that electrocutes the patron, again resulting in some harm. In both of those instances, it is at least arguable that the patron's injuries resulted directly from gaming activity, within the meaning of Bay Mills, i.e., "what goes on in a casino--each roll of the dice and spin of a wheel."

Id. (quoting Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 792, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014).

[5] IGRA's purpose is:

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702 (2018).

[6] Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.

25 U.S.C. § 2710 (2018) (emphasis added).






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 98, 769 P.2d 115, 59 OBJ 2457, Oklahoma Industries Authority v. Barnes
Discussed
 1935 OK 1027, 51 P.2d 266, 174 Okla. 286, STATE ex rel. C25288
Discussed
 2010 OK 58, 237 P.3d 199, STATE ex rel. EDMONDSON v. NATIVE WHOLESALE SUPPLY
Discussed
 1980 OK 15, 618 P.2d 900, State ex rel. Cartwright v. Dunbar
Discussed
 2015 OK 6, 345 P.3d 357, HORTON v. HAMILTON
Discussed
 2016 OK 55, 374 P.3d 820, AMERICAN BIOMEDICAL GROUP, INC. v. TECHTROL, INC.
Discussed at Length
 1985 OK 25, 698 P.2d 17, Frey v. Independence Fire and Cas. Co.
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 426, Affidavit
Cited
 12 O.S. 2056, Motion for Summary Judgment
Cited
Title 3A. Amusements and Sports
 Cite
Name
Level

 3A O.S. 281, Provisions of the Model Tribal Gaming Compact
Cited
Title 68. Revenue and Taxation
 Cite
Name
Level

 68 O.S. 2887, Property Exempt from Ad Valorem Taxation
Cited
 68 O.S. 3104, Tax Warrants - Forwarding Lien to Another County
Cited
 68 O.S. 2817, Listing and Assessment of Taxable Personal Property and Real Property
Cited
 68 O.S. 2831, Listing and Assessment of Property - Personal Property - Cattle or Livestock - Tangible Personal Property
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA